The **INDEPENDENT SOAP WORKERS OF SACRAMENTO, CALIFORNIA, Appellant,**

v.

The **PROCTER & GAMBLE MANUFACTURING COMPANY, Appellee.**

No. 18026.

United States Court of Appeals
Ninth Circuit.

Feb. 15, 1963.

Rehearing Denied March 21, 1963.

Patrick J. McCarthy, Sacramento, Cal., for appellant.

Jack G. Evans, Cincinnati, Ohio, Charles F. Prael, San Francisco, Cal., Dinsmore, Shohl, Barrett, Coates & Deupree, Cincinnati, Pillsbury, Madison & Sutro, San Francisco, Cal., of counsel, for appellee.

Before HAMLIN, JERTBERG and DUNIWAY, Circuit Judges.

JERTBERG, Circuit Judge.

Appellant, The Independent Soap Workers of Sacramento, California (hereinafter "Union") is a labor organization which, under a collective bargaining contract, represents certain employees of appellee, The Procter & Gamble Manufacturing Company (hereinafter "Company"), a corporation organized and existing under the laws of the State of Ohio and authorized to do business in the State of California.

The Union appeals from an order of the district court denying its application filed under Section 301 of the Labor-Management Relations Act of 1947 (29 U.S.C. § 185) to compel the Company to submit to arbitration a labor dispute involving one Norman Raiser (a member of the Union) in accordance with and pursuant to the collective bargaining contract.

No question is raised on this appeal as to the jurisdiction of the district court or of this Court.

The essential facts of this case are not in dispute and may be summarized as follows:

On or about August 5, 1960, a collective bargaining contract was entered into between the Union and the Company under which the Union became the exclusive bargaining representative of certain employees of the Company at its Sacramento plant. On November 19, 1960, one Norman Raiser, a member of the Union, and an employee of the Company at its Sacramento plant, was sent home from work by his foreman four hours in advance of his usual quitting time. The basis of this action was an alleged inattention to Raiser's duties as a "tank farm operator" in that he had overfilled a tank car with certain stock of the Company so that a quantity of it was lost. At that time Raiser was not given an unsatisfactory work report, nor was he given a warning notice. His record on the whole was good but did contain certain entries of prior errors in the performance of his work assignments. On November 21, 1960, Raiser was notified to attend a meeting relative to the incident of November 19th. There were present at the meeting the president of the Union, the department foreman, Raiser's foreman, and the personnel manager of the Company. At the meeting a draft of a proposed unsatisfactory work report entry for Raiser's permanent record was read. Opportunity for Raiser to speak was granted, and the draft was entered on his record. The entry included a warning that future errors might lead to the imposition of discipline, including possible suspension or termination of his employment. Raiser was then disqualified for the work of a "tank

farm operator" and was put into a general labor pool at a decreased pay rate. Since November 21, 1960, Raiser has made no bid for position as such operator. At the hearing the president of the Union contended that Raiser had not been responsible for at least one entry of error in the performance of his duties which appeared on his work record, and contended that Raiser's demotion was a taking away of his seniority rights and the Company was not entitled to do so under the the terms of the collective bargaining contract. The Union filed a grievance with the Company, pursuant to the provisions of Article XV of the agreement, over the demotion of Raiser.

Article XV of the collective bargaining agreement, in pertinent part, provides as follows:

"ARTICLE XV
GRIEVANCE PROCEDURE"

"a. Definition of Grievance

"A grievance is any difference between the Company and an employee about what any part of this Agreement means or how it should be applied; or any matter directly affecting the employee as to hours of work, wages and working conditions.

"b. Grievance Procedure

"If an employee has a grievance it shall be adjusted according to the following procedure.

"Step 1: The employee or his steward shall first present his grievance to his foreman or department manager.

"Step 2. If not settled, the employee or his steward will present it to the group manager.

"Step 3: If not settled, the grievance will be put in writing and taken to the Plant Manager or his representative by the Union Executive Board.

"Step 4: A grievance not adjusted by these steps may be taken to a

Board of Arbitration by either party within 60 days of the initial presentation. In this event, the Company and the Union shall each select an arbitrator within 15 days after such request. The two they name shall pick a third. If they cannot agree on the third arbitrator within 10 days, they shall ask for lists of arbitrators from the American Arbitration Association from which they may select and agree on the third arbitrator.

"It is understood that arbitration will be limited to grievance involving the interpretation or application of the provisions of this Agreement. The Company and the Union will stipulate the grievance jointly in writing and the Board will act only on the stipulation and will not add to nor take away from the terms of this Agreement in making this decision.

"The majority decision of any 2 of the 3 arbitrators shall be final and binding on both Company and Union."

The grievance was processed through the first three steps of the grievance procedure without settlement of the grievance. The Union demanded arbitration. The Company declined to submit the dispute to arbitration, declined to enter into a joint stipulation for that purpose, and declined to appoint an arbitrator. The Union appointed its president as its arbitrator and offered a proposed stipulation of the grievance for arbitration.

The Company takes the position that the grievance does not involve "the interpretation or application of the provisions" of the collective bargaining agreement and that it can exercise its discretion and refuse to arbitrate by declining to enter into a joint stipulation.

In its memorandum and order denying the Union's petition to compel the Company to arbitrate, the district court held that but two issues were presented to it for determination. These issues are: (1) Does the action taken by the Company against Raiser involve a problem or

interpretation or application of the agreement; and (2) Under the arbitration provisions of the agreement, can the Company be compelled to arbitrate?

Since the district court was of the view that the last question had to be answered in the negative, the court did not reach the first question.

The memorandum and order of the district court makes it crystal clear that the Union's petition to compel arbitration was not denied on the ground that the Raiser grievance did not involve the interpretation or application of the provisions of the bargaining contract.

The refusal of the district court to order arbitration is based entirely on the provisions contained in Step 4 of the arbitration clause that the parties "will stipulate the grievance jointly in writing and the Board will act only on the stipulation and will not add to nor take away from the terms of this Agreement in making this decision." In the course of its memorandum the district court stated:

"Article XV(b) provides that the arbitrator may consider only the information provided him by a joint stipulation, and that in doing so, nothing should be added by the Board to the terms of the Agreement. In interpreting this provision, it should be noted that the preliminary negotiations leading to the Agreement evidence an understanding by both parties that by this very means, either party could unilaterally evade the arbitration provisions of the Agreement.

"Particularly noteworthy is the abrupt change in language in Step 4 of Article XV(b). From terms of command, through the word 'shall,' in the first paragraph of that section, the Agreement turns to the use of the word 'will' in the second paragraph, dealing with the joint stipulation. Such a direct and complete change, when taken with the history of the negotiations, indicates a clear intention to make the joint stipulation a condition prece-

dent to the continued progress of proposed arbitration, but not a required consequence of previous failures to agree. * * *

"The basic policy in favor of arbitration as a vehicle for settling labor disputes must be read in context with the fact that 'arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit' (United Steelworkers of America, A.F.L.-C.I.O. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409). Company has not agreed to submit anything to arbitration in the absence of a joint stipulation and no provision appears in the Agreement which would require a joint stipulation as a necessary consequence of the failure of Steps 1, 2 and 3 of the grievance procedure of Article XV. Although this dispute may possibly involve the precise problem with which an arbitration provision is intended to deal, the terms of this particular provision are (and obviously were intended to be) so weak as to render it totally nugatory. The arbitration provision being a matter of contract, this Court cannot add anything to it to give it substance.

"The Collective Bargaining Agreement entered into by Union and Company contains no requirement that either one or both of the parties *must* stipulate the grievance as a mandatory consequence of the failure of Steps 1, 2 and 3 of the grievance procedure as set up in Article XV. The Agreement does however, limit the consideration of any arbitration board to such a joint stipulation. The arbitration clause of the Agreement is, for all practical purposes, nullified if either party elects not to enter into the required joint stipulation. Company is within its legal rights in refusing to stipulate the grievance in this case.

It would be an idle act for this Court to order arbitration where, in a case such as this one, no grievance is framed by the stipulation of the parties. Accordingly, the Court will not issue an order requiring Company to arbitrate." (Emphasis in quoted material.)

The end result of the holding of the district court is that under the provisions of Step 4 of Article XV(b) of the contract, a grievance (as defined in Article XV(a)) "involving the interpretation or application of the provisions" of the agreement is not arbitrable unless the parties jointly stipulate the grievance in writing. In other words, the arbitration may be barred by the unilateral action of either party by refusing to stipulate.

In the view of the district court, such intention is made clear by bargaining history and the use of the word "will" in the second paragraph of Step 4 following the use of the word "shall" in the first paragraph, considered in the light of bargaining history.

■ The parties do not dispute the rule that words in the collective bargaining agreement are to be interpreted in the background and light of bargaining history. Pacific Northwest Bell Telephone Company v. Communications Workers of America, 310 F.2d 244 (9th Cir.).

In the context in which used, we believe that no significance can be attached to the fact that the word "shall" appears in the first paragraph of Step 4 and the word "will" in the second paragraph. To us, the words, in context, are synonymous and connote words of command.

■ We have carefully reviewed all of the bargaining history in the record. We are aware that the arbitration clause contained in the 1953 collective bargaining contract between the parties is in the same form as the contract under review; that dissatisfaction therewith was expressed by Union representatives in discussions of grievances with Company officials in 1957 at a time after the expiration of the 1953 contract and prior to the commencement of negotiations leading up to the contract of August 5, 1960; and that throughout the negotiations culminating in the last mentioned contract the representatives of the Union unsuccessfully endeavored to modify or eliminate the joint stipulation provision. The review of bargaining history, however, reveals that throughout the bargaining negotiations the representatives of the Company repeatedly stated to and assured the Union representatives that so long as the grievance deals with the interpretation or application of the provisions of the contract, the joint stipulation provision was not intended to and would not be used to block arbitration.

If it was the intention of the parties by the language used in Step 4 that either party could unilaterally evade the arbitration provisions by refusing to stipulate the grievance, we are unable to perceive the intention of the parties in restricting arbitration to grievances involving the interpretation or application of the provisions of the agreement.

We note that Article XVII of the contract, which relates to "STRIKES AND LOCKOUTS," provides:

"The Union agrees that there will be no work stoppage, slowdowns, walk-outs, strikes, or any other interruption of work, and the Company agrees there will be no lockout, during the life of this Agreement, or during the processing of a grievance."

While we do not hold that the arbitration provision of the contract (Article XV) is the *quid pro quo* for the no strike provision (Article XVII) [See Drake Bakeries v. Local 50, Am. Bakery & Conf. Workers, etc. (1962), 370 U.S. 254, p. 261, footnote 7, 82 S.Ct. 1346, p. 1351, 8 L.Ed.2d 474], we believe that the inclusion in the contract of Article XVII is a factor to be considered along with the bargaining history in determining the intention of the parties in respect to the arbitration provision.

In United Steelworkers v. Warrior & Gulf Navigation Co., supra (1960), the full paragraph from which a quotation appears in the memorandum and order of the district court reads as follows:

"The Congress, however, has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. *An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.*" (Emphasis supplied.)

In light of the record before us and applying the guiding principles laid down by the Supreme Court, we hold that the district court erred in concluding that the parties intended that either party could unilaterally evade the arbitration provisions of the agreement by the simple expedient of refusing to stipulate the grievance. In our view, the intent of the parties derived from the agreement and the bargaining history is that the parties must jointly stipulate the grievance in any case in which either party contends, in good faith, that the grievance involves the interpretation or application of the provisions of the agreement.

The order of the district court denying the Union's petition to compel arbitration is set aside and the cause is remanded to the district court to determine whether or not the "Raiser" grievance involves the interpretation or application of the provisions of the agreement.