**INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO, Appellee.**

v.

**GENERAL ELECTRIC COMPANY, Appellant.**

No. 253, Docket 28364.

United States Court of Appeals
Second Circuit.

Argued Jan. 27, 1964.

Decided May 26, 1964.

Nordlinger, Riegelman, Benetar & Charney, New York City (David L. Benetar, Thomas F. Hilbert, Jr., H. H. Nordlinger, Martin Zeiger, New York City, of counsel), for appellant.

Baker & Diamond, Stamford, Conn. (Bertram Diamond, Stamford, Conn., of counsel); Benjamin C. Sigal, Washington, D. C., for appellee.

Before LUMBARD, Chief Judge, and WATERMAN and MARSHALL, Circuit Judges.

WATERMAN, Circuit Judge.

This is an appeal from a decision of the United States District Court for the District of Connecticut, determining that a labor dispute is arbitrable. Plaintiff, International Union of Electrical, Radio, and Machine Workers, AFL–CIO, originally brought suit against defendant, General Electric Company, in the Superior Court for Fairfield County, Connecticut, in June of 1958, to compel the company to arbitrate a grievance which had arisen under its collective bargaining agreement with the union. The Connecticut Superior Court ruled in favor of the company and dismissed the union's complaint on the ground that the complaint failed to state a cause of action; but upon appeal the Supreme Court of Connecticut reversed and remanded, International Union of Electrical, Radio & Machine Workers, A. F.L.–C.I.O. v. General Electric Co., 148 Conn. 693, 174 A.2d 298 (1961). Thereupon the company removed the case to the U. S. District Court below, where suit could have originally been brought, Labor Management Relations Act, § 301 (a), 29 U.S.C.A. § 185(a), and there, after a denial of the union's motion to remand to the state court, the parties agreed that no appeal would be taken upon the ground of any alleged jurisdictional defect based upon the removal. After the relevant facts had been stipulated, the district court then granted the union's motion for summary judgment and ordered that the grievance be submitted to arbitration despite the following objections of the company: (1) that the grievance did not constitute an arbitrable dispute under the collective bargaining agreement; (2) that prior related action by the National Labor Relations Board had foreclosed submission of the dispute to an arbitrator; and (3) that, after the company's refusal to arbitrate, a strike which had been called by a plant local of the union, Local No. 203, precluded the union from thereafter seeking arbitration. We affirm the granting of the motion for summary judgment.

The grievance at issue arose when the company decided to make use of an independent construction firm in relocating, within its plant at Bridgeport, the manufacturing facilities of its Automatic Blanket and Fan Department. This project involved the purchase and installation of new equipment and machinery, the moving of machinery, and the remodeling of certain buildings. The union claims that this decision to subcontract by the company gave rise to an arbitrable question of whether in so doing the company violated the union recognition, job description, and seniority provisions of its 1955–1960 collective bargaining agreement with the union.[1]

1. The 1955–1960 collective bargaining agreement was in the form of a "Settlement Agreement" comprised of four parts: (1) 1955–1960 Wage Agreement; (2) 1955–1960 Pension and Insurance Agreement; (3) 1955–1960 GE-IUE National Agreement; (4) General Provisions. The 1955–1960 GE-IUE National

Article XV of that agreement, the basic arbitration provision, provides that "any grievance which remains unsettled after having been fully processed pursuant to the provisions of Article XIII [describing the grievance procedure], and which involves either, (a) the interpretation or application of a provision of this Agreement, * * * shall be submitted to arbitration * * *." Another part of Article XV excludes from the province of an arbitrator certain types of questions not relevant here.

This grievance has been fully processed as per Article XIII of the bargaining agreement; and it is clear that Article XV, on its face, is sufficiently broad to require arbitration. Article XV, the standard type of arbitration clause used in most bargaining agreements providing for the arbitral process, states that "any" grievance which remains unsettled after preliminary processing shall be submitted to arbitration if it involves the "interpretation or application of a provision of this Agreement." By lodging this grievance against the company's subcontracting of this work—a type of grievance which, incidentally, we have had occasion to label a "garden variety" grievance, Procter & Gamble Independent Union of Port Ivory, N. Y. v. Procter & Gamble Mfg. Co., 298 F.2d 644, 645 (2 Cir. 1962)—the union certainly called into question the proper interpretation to be accorded several provisions of this collective bargaining agreement. Indeed, in a previous case involving the same parties and this same contract, this court held arbitrable a grievance involving the quite similar question of the company's right to assign certain work to regular company employees outside the bargaining unit. Carey v. General Electric Co., 315 F.2d 499, 505 (2 Cir. 1963), cert. denied, 84 S.Ct. 1162 (1964).

■ ■ It is the company's position, however, that even though the union's subcontracting grievance may be *prima*

*facie* within the coverage of the arbitration clause, the parties nevertheless agreed in their bargaining contract to exclude subcontracting questions from submission to arbitration. Of course, one who undertakes to foreclose arbitration by employing this line of argument assumes a heavy burden, for, as the Supreme Court said in the now famous case of United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 584–585, 80 S.Ct. 1347, 1354, 4 L.Ed. 2d 1409 (1960), where parties to a collective bargaining agreement have provided for the arbitration of grievances, then "[i]n the absence of any express provision excluding a particular grievance from arbitration * * * only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where * * * the exclusion clause is vague and the arbitration clause quite broad." This court has framed the rule in the following terms: "The nub of the matter is that under the broad and comprehensive standard labor arbitration clause every grievance is arbitrable, unless the provisions of the collective bargaining agreement concerning grievances and arbitration contain some clear and unambiguous clause of exclusion, or there is some other term of the agreement that indicates beyond peradventure of doubt that a grievance concerning a particular matter is not intended to be covered by the grievance and arbitration procedure set forth in the agreement." Procter & Gamble Independent Union of Port Ivory, N. Y. v. Procter & Gamble Mfg. Co., supra, 298 F.2d at 645–646.

■■ What is therefore remarkable about the company's position in the present case is that the company, far from pointing to an exclusionary clause which clearly and unambiguously removes certain grievances from the jurisdiction of the arbitrator, urges us to find the grievance at issue not arbitrable by utilizing

Agreement was the basic labor contract which the parties executed, and, for the sake of convenience, references to the

parties' bargaining agreement in this opinion will, unless otherwise indicated, refer to the National Agreement.

a contractual provision which does not even purport to be an exclusionary clause in the light of bargaining history. The contractual provision relied upon is one found in the 1955–1960 "Settlement Agreement," of which the 1955–1960 "National Agreement," the basic collective bargaining agreement already alluded to, is a part. The provision is no more than the customary "wrap-up" clause which is inserted at the end of most bargaining agreements, and it provides, in relevant part, as follows:

"1. This Settlement Agreement shall remain in effect from August 15, 1955 to October 1, 1960.

"2. This Settlement Agreement, the 1955 Wage Agreement set forth in Part One hereof, the 1955 Pension and Insurance Agreement to be executed by the parties as provided in Part Two hereof, and the 1955 GE-IUE (CIO) National Agreement set forth in Part Three hereof, are intended to be and shall be in full settlement of all issues which were, or which the Union, the Locals or the Company had by law the right to make, the subject of collective bargaining in negotiations between them preceding the execution of this Agreement."

Noting that the union tried several times unsuccessfully to insert into the 1955–1960 agreement contractual limitations on subcontracting, once in preliminary negotiations in 1954 and again during negotiations for a limited reopening of the agreement in 1958,[2] the company

urges upon us what is, essentially, the following argument: (1) The arbitration clause covers only grievances involving the interpretation or application of "a provision" of the agreement; (2) the above bargaining history and the "wrap-up" clause indicate that no "provision" of the 1955–1960 contract restricts the right of the company to subcontract; (3) therefore, the arbitration clause does not cover subcontracting since there is no substantive provision of the contract upon which it can operate.

■ No claim could be further from a claim based upon a reliance upon a clear and unambiguous clause excluding subcontracting from arbitration than this claim which the company here advances. What the company has done, under the guise of labeling a wrap-up clause as some sort of exclusionary clause, is to attempt to persuade us to decide that the grievance is not arbitrable because the grievance is groundless inasmuch as no substantive provision of the collective bargaining agreement, according to the company, forbids or restricts subcontracting. But whether a certain brand of company conduct is prohibited by a provision of a collective bargaining agreement will always be the ultimate question which the grievance itself will present; and whether this company and union ever agreed to permit unrestricted subcontracting of work, an issue upon which the presence or absence of a wrap-up clause would seem to have little if any bearing,[3] is the very question which the arbitrator will have to decide. For us to yield to the urgings

2. Whatever the weight to be accorded bargaining history in the case at bar, we cannot consider what transpired during the 1958 negotiations, for those negotiations were conducted after the refusal of the company to arbitrate the grievance, and even after the union had commenced this suit in the Connecticut courts to compel arbitration. For the same reason we also reject as not constituting forceful evidence of an agreement to exclude the grievance from arbitration the bargaining history of negotiations conducted in 1960 for a new contract.

3. The wrap-up clause does no more than express the fact that the collective bargaining contract was intended to represent the complete agreement of the parties. It is difficult to see how the weight to be accorded the absence in the agreement of a clause which the union tried to secure should be changed by this formal statement of what would otherwise be assumed. Thus, the argument which the company here makes against arbitrability is the same one which would be made if there were no wrap-up clause in the contract which could be seized upon and called an exclusionary clause.

of the company and decide it ourselves would be to ignore the admonition contained in the Warrior & Gulf case that courts should not become "entangled in the construction of the substantive provisions of a labor agreement". 363 U.S. at 585, 80 S.Ct. at 1354.

The impropriety of using the bargaining history which has been cited to us to declare this grievance non-arbitrable is not lessened by the company's reminder that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute he has not agreed so to submit."[4] Assuming that the bargaining history behind an arbitration or exclusion clause can legitimately be used to determine the scope of the contractual promise to arbitrate,[5] the bargaining history in this case is not helpful in clarifying the meaning of the words used in any such clause. It is not designed to show that the parties, in drawing up their arbitration clause, intended to limit the promise to arbitrate to certain classes of disputes; nor is it designed to show that the parties, in agreeing to an exclusionary clause, meant to withhold from an arbitrator certain types of questions. Rather, its only purpose is to show that, since the union tried unsuccessfully to incorporate into the bargaining agreement a substantive provision restricting the type of work which the company could subcontract, none of the substantive provisions upon which the union has grounded the grievance here involved prohibit subcontracting. In short, while this bargaining history may prove very useful to an arbitrator in examining this grievance to determine whether the company has violated any provision of the contract by its subcontracting of work, it is of no legitimate use to a court in deciding whether to order the company to submit the grievance to an arbitrator. See Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 283 F.2d 93 (3 Cir. 1960).

Neither of the two Ninth Circuit cases the company relies upon in its brief constitutes authority for the broad use of bargaining history which the company would have us undertake.[6] In Pacific Northwest Bell Tel. Co. v. Communications Workers, 310 F.2d 244 (9 Cir. 1962), the court, though remanding the case to the district court for that court to take into consideration the bargaining history which showed that the union had unsuccessfully attempted to include within reach of the arbitration clause the type of dispute there at issue, indicated that bargaining history touching upon the merits of a grievance could not be considered, and expressly rejected the type of bargaining history argument urged by the company here. 310 F.2d at 248. And in Independent Soap Workers v. Procter & Gamble Mfg. Co., 314 F.2d 38 (9 Cir.), cert. denied, 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1031 (1963), the court merely looked at the

4. All too often those who rely on this statement from United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, 363 U.S. at 582, 80 S.Ct. 1347, 1353, urge at the same time that the rules of construction set forth in that opinion for interpreting an agreement to arbitrate be disregarded.

5. Since bargaining history would appear to be a proper device for interpreting a contractual provision only when that provision is ambiguous or otherwise unclear, and since an exclusionary clause to be effective must be clear and unambiguous, one might properly question the use of any bargaining history to indicate that a clause in a bargaining contract has been designed to exclude a certain type of

grievance from arbitration. See also the discussion in this opinion, *infra*, of the treatment accorded bargaining history by the majority in the Warrior & Gulf case and by this court in Local 12298, District 50, United Mine Workers of America v. Bridgeport Gas Co., 328 F.2d 381 (2 Cir. 1964).

6. We intimate no opinion as to the view expressed in those cases that some types of bargaining history may be used in resolving questions of arbitrability. Compare with the Ninth Circuit cases discussed above, International Union of Electrical, Radio and Machine Workers, AFL-CIO v. Westinghouse Electric Corp., 228 F.Supp. 922 (U.S.D.C.S.D.N.Y., Mar. 24, 1964).

bargaining history of the arbitration clause itself, in the form of assurances by the employer that certain words in the clause would not be used to block arbitration, in order to resolve a procedural arbitration problem in favor of the arbitrability of a grievance. Moreover, our unwillingness to use bargaining history to foreclose arbitration of this dispute is greatly reinforced by the fact that, as is apparent from accompanying concurring and dissenting opinions, the majority in Warrior & Gulf, faced with having to determine whether an exclusionary clause prevented arbitration of a subcontracting grievance, refused to even mention bargaining history that showed repeated unsuccessful attempts by the union to secure contractual restrictions on subcontracting. See also Local 12298, District 50, United Mine Workers of America v. Bridgeport Gas Co., 328 F.2d 381 (2 Cir. 1964) and the treatment there of bargaining history as brought out in the dissenting opinion at 328 F.2d 385–386.

## II

We deal now with the company's argument that arbitration of this grievance should not be ordered because of related strike action engaged in by a local of the union, Local 203, prior to the institution of this court proceeding, and because of certain official action which the National Labor Relations Board took, also prior to the institution of this proceeding, as a result of that strike. On April 28, 1958, resolution of the grievance having failed at the local level, the union and the company met on the headquarters level in New York City to discuss the matter. This meeting represented the final step in the grievance procedure prior to arbitration. At the meeting, authorized company spokesmen informed union representatives that the company denied that the subcontracting violated any provision of the bargaining agreement, and on the following day, April 29, the company gave the union the same answer to its grievance in written form. That same day about 140 maintenance

employees in the union's Bridgeport bargaining unit engaged in a strike and picketed the company's Bridgeport plant in accordance with a strike vote which had been taken by the maintenance employees the night before. The strike, which had the support and approval of the union's Local 203 and which was never disavowed by the international union, was to last through May 14.

In response to the strike, the company, on April 30, filed charges with the National Labor Relations Board accusing Local 203, its president, and the international union of having violated Sections 8(b) (4) (A) and (D) of the National Labor Relations Act, 29 U.S.C. §§ 158(b) (4) (A) and (D). The Board's Regional Director, acting pursuant to Section 10 (*l*) of the Act, then filed a petition for an injunction against Local 203 and its president in the United States District Court for the District of Connecticut, but after hearings on the petition had been held the case was continued without entry of a final order because of assurances by the respondents that the strike and the picketing would be discontinued. At the same time the Board and the respondents entered into a written stipulation providing for the issuance of a cease and desist order by the Board and a consent order to enforce it, and included in their stipulation the following paragraph:

"(8) This Stipulation contains the entire agreement between the parties, there being no agreement of any kind, verbal, or otherwise, which varies, alters, or adds to it. The execution and signing of this Stipulation by the Respondents does not constitute an admission that the Respondents have violated any provision of the Act nor does it constitute a waiver by the Respondents of their claims that the employees represented by Respondent labor organization were entitled to perform the disputed work described in the Notice of Charge Filed and Notice of Hearing pursuant to Section 10 (k) and in the consolidated Complaint, and that the Company's as-

signment of such disputed work constituted a breach of the existing collective bargaining agreement heretofore made by and between the International Union of Electrical, Radio and Machine Workers, AFL-CIO and the Company."

The company's contention that this strike foreclosed arbitration of the grievance is wholly without merit.[7] Article XIV of the bargaining agreement provides only that "there shall be no strike * * * in connection with any matter subject to the grievance procedure * * * unless and until all of the respective provisions of the successive steps of the grievance procedure * * * shall have been complied with * * * or if the matter is submitted to arbitration." The bargaining agreement in no way expressly conditions the availability of arbitration upon there have been no strike over the grievance, and no such condition may be legitimately read into the agreement. Drake Bakeries v. Local 50, American Bakery & Confectionery Workers, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962). Thus, whether the strike was or was not a breach of the parties' collective bargaining agreement, and there is more than a little doubt that it was, we cannot accept the company's contention that the union, by choosing to strike, effected an election of remedies which now bars arbitration. Moreover, while the decision to strike may have amounted to a determination by the union to use one of several alternative methods available to it for resolving its dispute with the company, it most certainly did not constitute an election between two available judicial remedies.

The company also contends that, inasmuch as the Board's issuance of the cease and desist order in 1958 necessarily required a decision that the parties' collective bargaining agreement did not prohibit the contracting out of the disputed work, see N. L. R. B. v. Radio and Television Broadcast Engineers Union, 364 U.S. 573, 577 n. 12, 81 S.Ct. 330, 333, 5 L.Ed.2d 302 (1961),[8] to order this grievance submitted to arbitration now would be to permit a collateral attack on a prior Board determination. This argument we cannot accept. Whatever may be the effect of a final Board adjudication of a Section 8(b) (4) (D) violation on an arbitrator's jurisdiction, it is clear that the cease and desist order issued in the instant case cannot bar arbitration of this grievance. As the court below noted, the issue of the contract right of the bargaining unit employees to the work assigned to the independent contractor was never fought out or decided in proceedings before the Board, and the Board expressly agreed, in the stipulation providing for the order designed to halt the strike, that the union was not relinquishing any claims that the company's subcontracting of work breached the collective bargaining agreement. No more reason exists for refusing to order arbitration here than there does in the case where, although Board jurisdiction exists over conduct underlying a grievance, that jurisdiction has remained wholly unexercised. Carey v. Westinghouse Electric Corp., 375 U.S.

7. The company contended below that the strike barred arbitration on the grounds that the union by having engaged in the strike (1) had breached the bargaining contract; (2) had waived or repudiated its right to arbitration of this grievance; and (3) had made an election of remedies which barred it from seeking arbitration. The trial court properly rejected the first two of these contentions, see Drake Bakeries v. Local 50, American Bakery & Confectionery Workers, 370 U.S. 254, 82 S.Ct. 1346 (1962), and the company has abandoned them on appeal. Now the company's sole argument on this issue is that the strike constituted an election of remedies.

8. "[T]he Board has adopted the position that jurisdictional strikes in support of contract rights do not constitute violations of § 8(b) (4) (D) despite the fact that the language of that section contains no provision for special treatment of such strikes."

261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); Carey v. General Electric Co., supra, 315 F.2d at 508–511. See Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); Local 174, Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962).

 To order this grievance submitted to arbitration is not to deny that consent orders represent as much an expression of Board policy as orders issued after full-dress litigation; nor is it to impinge upon the rule requiring Courts of Appeals to enforce consent orders as drawn, N. L. R. B. v. Ochoa Fertilizer Corp., 368 U.S. 318, 82 S.Ct. 344, 7 L.Ed. 2d 312 (1961). The consent order in this case was directed toward strike activity, not the arbitration of this grievance, and the stipulation which accompanied it was designed to permit these parties to resolve their private differences as to the meaning of their bargaining agreement before some forum other than the Board. Whatever the Board's opinion as to the meaning of this contract which prompted it to proceed against the strikers at Bridgeport, it is clear that the Board was content to effect what it regarded as proper labor policy by merely halting the strike with a consent order accompanied by a reservation. Such an order is entitled to judicial enforcement as drawn, but it is the order which is entitled to enforcement and not a contract interpretation which prompted the proceedings which have spawned the order.

Affirmed.

LUMBARD, Chief Judge (dissenting).

I dissent.

It is the duty of the courts to interpret the arbitration provisions of collective bargaining agreements according to the intention of the parties as they have expressed it and in light of the circumstances surrounding the negotiations between the parties and the execution of the agreement. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 584–585, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241–242, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962).

The Supreme Court has admonished us that in the absence of an express provision excluding from arbitration a particular grievance, "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, 363 U.S. at 585, 80 S.Ct. at 1354. I believe that General Electric has adduced such forceful evidence that its right to subcontract work was not subject to the general arbitration clause embodied in the collective bargaining agreement.

The agreement contains no express provision with respect to subcontracting. However, Part Four of the 1955–60 Settlement Agreement provides that the agreement is "intended to be and shall be in full settlement of all issues which were, or which the Union, the Locals, or the Company had by law the right to make, the subject of collective bargaining in negotiations between them preceding the execution of this Agreement." These words gather meaning from the context of the negotiations which immediately preceded the execution of the agreement. During the negotiations in 1954 the union presented to management a series of demands, among them a demand that the company "cease the farming out of work which could be done in GE plants." The company rejected this demand, and no contractual provision relating to subcontracting was included in the agreement.

That the union itself recognized that the issue of subcontracting had been excluded from the collective bargaining agreement is apparent from the events that followed. The Settlement Agreement provided for a reopener in 1958 to discuss "proposals for contracting with regard to any question directly relating to employment security which

may be submitted by either the Union or the Company." In 1958 the union in fact proposed alterations in the bargaining agreement, in light of its objection to the company's "subcontracting work that properly belongs in the bargaining unit." The union argued that "This provision should be incorporated in our agreement and the manner in which subcontracting may be carried on should be spelled out." The company rejected this demand, and the agreement was left intact in this regard. Again in 1960 the union sought to have incorporated in the bargaining agreement a provision concerning subcontracting, and once again the company rejected this demand.

All of these facts taken together lead me to the conclusion that there was no agreement to arbitrate any dispute arising out of the company's subcontracting for plant expansion work.

The company's reasons for refusing to agree to arbitration regarding subcontracting are quite apparent from the events which triggered this dispute. Much of the work to be performed in the renovation and remodelling of the plant and the installation of new machinery, estimated to cost $1,750,000, could not be done by General Electric employees. When the company suggested to its subcontractor, Gellatly Construction Company, that General Electric workers might do some of the work, Gellatly pointed out that this was practically impossible inasmuch as its employees were members of a rival union and would not work alongside of members of the International. Under the majority's decision, General Electric cannot safely subcontract with any one not in its employ to do anything unless it first secures the consent of the union or is willing to submit to the uncertainties of arbitration in an area normally left entirely to management. While the company might, of course, have agreed to this strait-jacket, it seems absurd to suppose that either the union or the company could think it had done so in light of its persistent refusal to accept the union's demands that it do so.

Surely the parties did not agree to arbitrate every conceivable claim. But by the reasoning of the majority we are pretty close to the point of holding that every claim must be arbitrated because at the very least it involves the question whether by some process of reasoning the claim may involve tangentially some provision in the agreement. We do a grave disservice to the salutary cause of arbitration when we compel a company to arbitrate under such circumstances. We defeat our national labor policy when we leave to management as its sole source of self-protection against arbitration of all disputes insistence upon the recital in the bargaining agreement of a multitude of matters which are not to be arbitrated, or, more likely, refusal to agree to arbitration about anything lest it unwittingly be required to arbitrate everything. With unions constantly seeking the inclusion of more matters in their written labor agreements, the majority ruling would seem to open up a one-way street for the benefit of the union. In my view, where there is no persuasive reason to believe that the parties could have thought that certain matters might in the future be the subject of arbitration under the terms of an agreement then governing their relations, we should hold that there was no agreement to arbitrate.

It is not our proper business to rewrite a labor agreement which is the result of long and hard-fought negotiations between management and labor. It is as much our duty, after careful scrutiny of the agreement, to reject arbitration where the parties never intended it to be applicable as it is to require arbitration where the parties have seen fit to provide for this form of adjudication. The record here establishes that arbitration of disputes regarding subcontracting was never intended by the parties.

I would reverse the judgment of the district court and grant the company's motion for summary judgment.