LOCAL UNION 24, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, an unincorporated association, Plaintiff,

v.

WM. C. BLOOM & CO., Inc., a corporation, Defendant.

Civ. A. No. 15703.

United States District Court
D. Maryland.

June 2, 1965.

**422**

Thomas X. Dunn, and Louis Sherman, Washington, D. C., for plaintiff.

Donald N. Rothman, David P. Gordon, David H. Fishman, and Gordon, Fein-blatt & Rothman, Baltimore, Md., for defendant.

WINTER, District Judge:

Suit has been filed, under § 301 of the Labor Management Relations Act, as amended, 29 U.S.C.A. § 185, to enforce an award under a collective bargaining agreement by and between plaintiff and Maryland Chapter of the National Electrical Contractors Association, Inc. (hereafter called "NECA"), to which it is alleged defendant was a party, and under which it is further alleged defendant was bound. The award was made June 16, 1964 by the Labor-Management Committee established by the agreement. The award found that defendant, since October 1, 1963, had been in violation of the collective bargaining agreement, in

that defendant had not paid the wages prescribed by the agreement to its residential and garden-type apartment wiring employees (hereafter called "house wiring employees"), had not made health, welfare and pension contributions on their behalf, nor used the referral system established by the agreement. On June 30, 1964, counsel for plaintiff called upon defendant to abide by the determination of the Committee and, by letter dated July 7, 1964, defendant advised that it had no intention of abiding by the award of the Labor-Management Committee. This suit was filed July 16, 1964.

Plaintiff's motion for summary judgment was denied November 4, 1964. After a pretrial conference, the matter was set down for hearing and testimony taken. As developed in the pleadings, at the pretrial conference and at the trial, defendant resists enforcement of the award, upon four grounds: (1) defendant was not a party to the agreement and not bound by its terms and conditions, (2) the award was not an arbitration award and was not final and binding, (3) the award was capricious, arbitrary and procured by undue means, and (4) the agreement had no application to defendant's house wiring employees. The facts as disclosed by the evidence relating to each of these contentions will be found in the consideration of each contention.

1. *Contention that defendant was not a party to the agreement and not bound by its terms.*

The agreement by and between plaintiff and NECA was consummated October 1, 1963. In its preamble the agreement recited:

"Agreement made this 1st day of October, 1963, by and between the Baltimore Division, Maryland Chapter, NECA, Inc., on behalf of its employees who employ workmen under the terms and conditions contained herein, *and have signed a letter of assent,* to be bound by this Agreement for its duration as set forth below, and Local Union No. 24, IBEW. It shall also apply to other individual employees who employ

workmen under the terms of this Agreement and by virtue of signing a similar letter of assent, authorize the Baltimore Division, Maryland Chapter, NECA, Inc., as their collective bargaining agent for all matters contained herein or affecting this Agreement, including all amendments or revisions adopted pursuant thereto. * * * " (emphasis supplied)

By its terms the agreement recited that it "shall take effect October 1, 1963" and shall remain effective until March 31, 1965, with a provision that it might continue thereafter from year to year unless changed or terminated in the manner prescribed in the agreement.

Defendant's contention that it was not a party to or bound by the agreement rests upon the undisputed fact that it never signed a letter of assent, as required by the italicized language in the quotation of the preamble set forth above. The statement of additional facts relating to this contention demonstrates its lack of merit:

The agreement of October 1, 1963 succeeded an agreement dated September 25, 1961. The 1963 agreement for the first time contained a provision requiring a letter of assent. The 1961 agreement was signed by each of the members of NECA, including defendant, but the 1963 agreement was signed by three individuals describing themselves as the negotiating committee for NECA and three individuals describing themselves as the negotiating committee for plaintiff. The evidence shows that a regular meeting of NECA was held Tuesday, September 24, 1963, at which the proposed 1963 agreement was submitted to the membership. Defendant, through the person of Mr. William C. Bloom, was present at the meeting, and the minutes disclose that the members present unanimously voted to accept the agreement as negotiated by the committee acting on behalf of NECA.

Notwithstanding that by its terms the agreement became effective October 1, 1963, NECA did not mail the form of letter of assent to its members until November 8, 1963. It seems clear that the necessity of a signature on a letter of assent was not considered by the parties to be a matter of great importance, because one of the members of NECA who had a representative serving on the Labor-Management Committee, and who otherwise took an active part in labor-management matters and unquestionably considered itself bound by the agreement, did not sign a letter of assent until August, 1964.

■ Defendant's conduct indicates that it considered itself bound by the agreement, although defendant resigned from NECA in December, 1963. Prior to its resignation, defendant availed itself of hiring facilities provided under the contract, and complied with the wage rates for electricians working on commercial projects as established by the contract. Further, subsequent to its resignation, when defendant appeared before the Labor-Management Committee it failed to assert that it had not been a party to or bound by the contract at the time when the matter of wage rates applicable to house wiring employees was called into question. As to the latter action, it is no answer, as argued by defendant, that Mr. Bloom appeared at the hearing without knowledge or advice of counsel when he had already engaged counsel to represent him in other aspects of the dispute, or that Mr. Bloom had suffered a nervous breakdown almost two years before his appearance, and had been ill the year of his appearance with encephalitis. The Court concludes that, factually, defendant was a party to, and was bound by, the agreement.

2. *Contention that the award was not an arbitration award and was not final and binding.*

Consideration of this contention must begin with a quotation of the portions of the agreement establishing grievance procedures. Article I, §§ 4 et seq., of the agreement provides:

"Sec. 4. There shall be no stoppage of work either by strike or lockout because of any proposed changes in

this Agreement or disputes over matters relating to this Agreement. All such matters must be handled as stated herein.

"Sec. 5. There shall be a Local Labor-Management Committee of three (3) representing the Union and three (3) representing the Employer. It shall meet regularly once monthly. However, it shall also meet within 48 hours when notice is given by either party. It shall select its own chairman and secretary.

"Sec. 6. All grievances or questions in dispute shall be adjusted by the duly authorized representative of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within forty-eight hours, they shall refer the same to the Local Labor-Management Committee.

"Sec. 7. All matters coming before the Labor-Management Committee shall be decided by majority vote. Four (4) members of the Committee, two (2) from each of the parties hereto, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of its membership and it shall be counted as though all were present and voting.

"Sec. 8. Should this Committee fail to agree or to adjust any matter, such shall then be referred to the 'COUNCIL ON INDUSTRIAL RELATIONS FOR THE ELECTRICAL CONTRACTING INDUSTRY.' Its decisions shall be final and binding on both parties hereto.

"Sec. 9. When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matter arose shall not be changed or abrogated until the decision is rendered."

Defendant stresses that only when a grievance or question in dispute has reached the third stage, i. e., the stage of referral to the Council on Industrial Relations for the Electrical Contracting Industry, does the agreement provide that the decision of the adjudicating medium " * * * shall be final and binding on both parties hereto." Thus, defendant argues that a decision by the Labor-Management Committee is not final and binding and, hence, is not an arbitration award otherwise enforceable under § 301 of the Labor Management Relations Act, as amended 29 U.S.C.A. § 185.

In addition to the language of the agreement, there was evidence of how the agreement was construed by the parties in this regard. The Secretary and Director of Labor Relations of NECA testified that when a grievance or dispute arose the three steps of adjudication spelled out in the agreement were successively employed. If agreement was forthcoming at any stage the next successive step could not be employed. Specifically, he testified that if the Labor-Management Committee decided any grievance or question in dispute by majority vote, no appeal to the Council on Industrial Relations would lie.

■ Resolution of defendant's contention is controlled by Truck Drivers Union v. Riss & Co., 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963). In that case the grievance procedure in a collective bargaining agreement between a union and an interstate motor freight common carrier employer established a three-step grievance procedure to be applicable if the employer and the union could not resolve any dispute, namely, referral to a Joint Local Area Committee, Joint State Cartage Committee and Joint Area Cartage Committee, respectively. In a suit under § 301 of the Act to enforce a ruling of the Joint Area Cartage Committee, the United States Court of Appeals for the Sixth Circuit (General Drivers, etc., Local Union No. 89, v. Riss and Co., 6 Cir., 298 F.2d 341 (1962)), refused enforcement because, *inter alia*, "There is no finality to this grievance procedure" and "The order * * * was not an arbitration award which could be enforced by the courts * * *" (298 F.2d 342). The Supreme Court granted certiorari,

reversed the judgment and remanded the case, saying (p. 519 of 372 U.S., p. 791 of 83 S.Ct.) :

"It is not enough that the word 'arbitration' does not appear in the collective bargaining agreement, for we have held that the policy of the Labor Act 'can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play.' United Steelworkers v. American Mfg. Co., 363 U.S. 564, 566 [80 S.Ct. 1343, 1346, 4 L. Ed.2d 1403]: cf. Retail Clerks v. Lion Dry Goods, Inc., 369 U.S. 17 [82 S.Ct. 541, 7 L.Ed.2d 503]. Thus, if the award at bar is the parties' chosen instrument for the definitive settlement of grievances under the Agreement, it is enforceable under § 301."

■ The undisputed testimony that if a majority of the Labor-Management Committee reached agreement no further proceedings could be had before the Council on Industrial Relations (and in this case the Labor-Management Committee reached unamious agreement) constitutes such a decision by the Labor-Management Committee, " * * * the parties' chosen instrument for the definitive settlement of grievances" and makes it enforceable under § 301 of the Act. Indeed, an examination of the agreement shows that by other provisions not quoted, the decision of the Local Management Committee is a final determination with respect to causes for discharge and decisions regarding hazardous work. The conclusion is inescapable that the phrase "final and binding" used in Article I, § 8 of the Agreement, was not used in Article I, § 7 solely because of the possibility that a majority of the Labor-Management Committee could not agree on the proper resolution of any grievance or question in dispute, in which event there could be a referral to the Council on Industrial Relations. But, by the same token, when a majority of the Labor-Management Committee could agree, factually, the parties intended its decision to be final and binding.

3. *Contention that the award was capricious, arbitrary and procured by undue means.*

Defendant's contention in this regard, together with his contention that the decision of the Labor-Management Committee was not a final and binding arbitration of the dispute, served as the basis for denial of plaintiff's motion for summary judgment. At trial, and particularly in defendant's post trial memorandum, this contention was substantially abandoned.

At the trial the most that defendant proved was that one of the union members of the Labor-Management Committee, the same person who was business manager of the plaintiff, presented the charges against defendant to the Committee and, as a member of the Committee, participated in the adjudication that they were well-founded. It was proved, also, that defendant purported to resign as a member of NECA in December, 1963, but defendant does not claim that the resignation was effective as to the agreement. In other words, defendant apparently concedes that it was not relieved from its obligations until the agreement expired, or was earlier terminated, in accordance with its terms.

There was testimony from one of the employer representatives on the Labor-Management Committee that it was normal procedure for the business manager of plaintiff to present charges to the Labor-Management Committee and to participate in deciding those charges, and the business manager in question testified that in previous cases he had always participated in deciding charges which he had presented without objection from employer members. In accordance with the terms of the agreement, even if this presenting member of the Committee had refrained from voting the other two union members of the Committee could cast his vote. The employer member of the Committee who testified stated that

he had known Mr. Bloom, president of defendant, since 1946 and considered him a friend, notwithstanding his vote against the position advocated by Mr. Bloom on behalf of defendant before the Labor-Management Committee.

While the procedure of permitting a labor member of the Labor-Management Committee to present charges and then to vote as to whether they are meritorious does not reflect the same degree of objectivity on which the judicial process is founded, yet there is introduced into the adjudicating process the expertise which recent Supreme Court decisions stress as a necessary and desirable feature of resolution of labor disputes. In any event, there was nothing in the evidence to indicate that this was not a procedure to which the parties had agreed, or that it was in any sense unusual. Certainly, there was a complete failure of proof to show that the employer members of the Labor-Management Committee acted as a result of any improper motive, and the Court cannot infer that defendant's resignation from NECA in December, 1963 provided any motivation for the employer members to overreach any merit in defendant's proof or defendant's contentions before the Labor-Management Committee. The Court cannot ignore that the decision of the Committee was unanimous, even though, under the agreement, it need have been only by majority vote. On this record the Court finds as an ultimate fact that the decision was not capricious, arbitrary or procured by undue means.

4. *Contention that the agreement had no application to defendant's house wiring employees.*

Proper disposition of this contention involves consideration of the evidence adduced by defendant and applicable rules of law. Most of the evidence was received by the Court under a continuing objection by plaintiff that under applicable rules of law the evidence was incompetent to prove what was sought to be proved, but the Court received the evidence nonetheless to afford defendant a full opportunity to make its record and to afford the Court an opportunity to consider its materiality after considered reflection upon applicable precedents.

Defendant proved that in the Metropolitan Baltimore area there is wide divergence in the wage rates paid electricians engaged in house wiring and electricians engaged in commercial wiring; the latter being required to possess greater skill are paid almost double the wages paid the former. Electricians engaged in commercial wiring are unionized to a high degree; those engaged in house wiring are rarely union members.

The wage scale established by the agreement is the wage scale paid electricians engaged in commercial wiring. If an employer engaged in house wiring undertook to pay the union rates for electricians engaged in commercial wiring, he would be unable to compete and would be priced out of the market. Indeed, there was testimony that no one doing house wiring would have signed the agreement.

All of the twenty-three members of NECA, except defendant and possibly one other, are engaged exclusively in commercial wiring. Defendant was engaged in commercial and house wiring, but in the period 1961–1964 defendant did little commercial wiring. In fact, defendant's commercial wiring business represented less than five per cent of its total dollar volume.

The agreement effective October 1, 1963 was the first collective bargaining agreement in which plaintiff obtained a union shop clause. By the terms of the agreement all employees of employers bound by the agreement were required to join the union within eight (8) days following the dates of their employment or the effective date of the agreement, whichever was later (Article I, § 3). Defendant had at least twenty-three electricians as employees when the agreement became effective. This fact was known to plaintiff, but plaintiff undertook no steps to enforce union membership or to require defendant to make payments to the two health and welfare funds created and existing by and under the terms of the

agreement. This failure on the part of plaintiff, however, is explained in part by the fact that plaintiff was wracked by a bitter contest as to who would be elected business manager and a lack of communication between the actual business manager and the business manager designate in the interim between election and qualification of the new officer.

After the agreement became effective on October 1, 1963, plaintiff, in April or May, 1964, attempted to negotiate with defendant a new agreement covering only electricians engaged in house wiring at a wage rate substantially less than that prescribed for electricians engaged in commercial wiring. In fact, plaintiff filed an unfair labor practice charge with the Regional Office of the National Labor Relations Board in an effort to require defendant to negotiate such a new contract. The charge was withdrawn when defendant agreed to negotiate. Plaintiff claims that this effort stemmed from altruistic motives on its part to enable defendant and other members of NECA to become competitive in the field of house wiring, as well as to unionize other non-union house wiring employers who were not members of NECA. Because it was hoped that persons not presently members of NECA would enter into a collective bargaining agreement with plaintiff, the new form of agreement was a separate contract unto itself, rather than a simple amendment to the agreement of October 1, 1963, which by its terms could be amended by supplement.

Testimony was offered that at the time plaintiff attempted to negotiate an agreement for electricians engaged in house wiring with defendant, plaintiff threatened to take the position that house wiring electricians were covered by the October 1, 1963 agreement if defendant did not sign the proposed new agreement. The business manager of plaintiff testified that he simply stated that future liability under the agreement would be obviated. He claims that he said signing a new agreement would not wipe out that which was already due.

Mr. Bloom, on behalf of defendant, testified that he did not understand that the agreement required him to pay union rates to his house wiring electricians. NECA, through its secretary-manager, wrote a letter as of September 17, 1964 that it had not signed any agreement relating to house wiring. The evidence also shows that defendant has consistently taken the position in bargaining sessions concerning the proposed agreement for house wiring employees and in his appearance before the Labor-Management Committee that the agreement had no application to the house wiring employees.

From these facts, defendant strongly urges that it has shown conclusively that plaintiff never intended the agreement to apply to house wiring employees, that NECA never intended the agreement to apply to house wiring employees, that defendant never intended the agreement to apply to house wiring employees, and that, therefore, nothing contained in Article I of the agreement, the pertinent provisions of which have been previously quoted, gave the Labor-Management Committee any authority to resolve any disputes or to make any awards in regard to house wiring employees. Neither in oral argument nor in its post trial memorandum does plaintiff seriously controvert these facts, but plaintiff, with equal vigor, contends that, under the terms of the agreement and applicable authorities, these facts are not matters for consideration by the Court, but were for consideration by the Labor-Management Committee. Thus, plaintiff argues that the question of whether the agreement was applicable to defendant's house wiring electricians was a matter for arbitration before the Labor-Management Committee, that the function of the Court is limited to a determination that by its terms the agreement vested authority in the Labor-Management Committee to make the determination, and that, in making the determination, the defendant was given notice of the hearing and otherwise afforded procedural due process, so that the award should be enforced by the Court.

In support of its contentions, plaintiff relies on the trilogy of cases, United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 1363, 4 L.Ed.2d 1403 (1960), United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), and United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), with particular emphasis on the Warrior & Gulf case. Plaintiff also cites a decision of this circuit, A. S. Abell Co. v. Baltimore Typographical Union No. 12, 338 F.2d 190 (4 Cir. 1964).

 Warrior & Gulf arose under a collective agreement having both a "no strike" and a "no lockout" provision, and providing that "Should differences arise between the Company and the Union or its members employed by the Company as to the meaning and application of the provisions of this Agreement, or should any local trouble of any kind arise * * *" the grievances and arbitration procedures of the agreement should be employed. In holding that the language of the agreement required arbitration of the question of whether or not the employer had a right to contract out certain maintenance work and, in so deciding, failing to mention any of the substantial evidence of bargaining history indicating a contrary result, the majority of the court laid down basic rules in regard to arbitration under collective bargaining agreements. It was said that arbitration in labor matters was the preferred procedure for adjudication of differences and was to be encouraged. An order to arbitrate a particular grievance should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage" (pp. 582–583 of 363 U.S. p. 1353 of 80 S.Ct.). It was also said "In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad" (pp. 584–585 of 363 U.S., p. 1354 of 80 S.Ct.).

The A. S. Abell Company case, supra, from this circuit, stated generally in regard to the rules announced in the trilogy of Steelworkers cases, that they (p. 193 of 338 F.2d), "unmistakably encourage the resolution of disputes arising under collective bargaining agreements by arbitration rather than by the court, including issues * * * as to whether a particular dispute is arbitrable under the terms of the agreement."

 The application of the rule stated in Warrior & Gulf and the holding in the A. S. Abell case are subject to the qualification that: "The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty," John Wiley & Sons v. Livingston, 376 U.S. 543, 547, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964). As stated in Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, (1962): "Under our decisions, whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties." See also, Warrior & Gulf, supra, 363 U.S. p. 583, 83 S.Ct. 1353, n. 7.

In accordance with these statements, attention must be directed to the agreement in this case: Article I is headed "Effective Date—Termination—Changes—Grievances—Disputes." Article I, § 4 of the agreement, after stating that there shall be no stoppage of work either by strike or lockout because of " * * * any proposed changes in this Agreement or *disputes over matters relating to this Agreement*" states that "all *such* matters" must be handled as stated thereafter. Section 5 provides for the establishment of a local Labor-Management Committee.

Sections 6 and 7 state that "all grievances *or questions in dispute*" shall be adjusted by the duly authorized representatives of the parties to the agreement and, if they cannot agree within 48 hours, "they," i. e., "all grievances *or questions in dispute*," shall be referred to the Labor-Management Committee. By § 8 of the agreement, should this committee fail to agree or to adjust any matter, then "such" shall be referred to the Council on Industrial Relations.

 The terms of the agreement indicate that the parties sought to distinguish between the concept of "grievances" and the concept of "disputes over matters relating to this Agreement." Although they may overlap in part, the dichotomy preserved in §§ 4, 5, 6 and 7 makes clear the parties did not intend the words "grievances" and "questions in dispute, etc." to be completely synonymous, but did intend that each encompass a different area to be committed to the jurisdiction of the arbitrators. The essence of the dispute between the parties in this case is over a matter "relating to this Agreement;" it is one of the scope, i. e., coverage, of the agreement. Since the Labor-Management Committee's authority is not confined solely to decisions of "grievances," but rather extends to "disputes over matters relating to this Agreement," the conclusion seems inescapable that they had authority to decide a question of the scope of the agreement. While the provisions of Article I, §§ 4 et seq. are not quite as specific as those in the agreements in Warrior & Gulf, and the A. S. Abell case, supra, in that the arbitrators are not explicitly given jurisdiction of disputes as to the construction of the agreement, nevertheless these sections of the agreement are capable of the construction that authority is vested in the arbitrators to decide the question in dispute, even though it is in effect a question of the Labor-Management Committee's passing upon its own authority to arbitrate. See, however, Cox, Reflections Upon Labor Arbitration, 72 Harvard L. Rev. 1482, 1508–1509 (1959), to the effect that the language in the case at

bar is stronger to support the jurisdiction of the arbitrators to pass on their own jurisdiction than the language in Warrior & Gulf or A. S. Abell, supra.

 Since the grievance provisions of the agreement are found to be susceptible of the interpretation that the Labor-Management Committee has authority to decide the question of arbitrability, there remains the question of the extent to which the Court may consider and rely upon bargaining history to avoid enforcement of arbitration or enforcement of the award. Although bargaining history was not mentioned in the majority opinion, Warrior & Gulf, supra (p. 585 of 363 U. S., p. 1354 of 80 S.Ct.), teaches that " * * * only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." In this circuit the matter has been more specifically considered, and in the A. S. Abell Co. case, supra, where, like the case at bar, the agreement was susceptible of the interpretation that the arbitrators had authority to decide their own jurisdiction, the court approved the rejection of bargaining history, in accord with the decisions of other circuits referred to in the opinion, quoting with approval from International U. of Elec., R. & M. Wkrs. v. General Elec. Co., 332 F.2d 485, 490 (2 Cir. 1964), " * * * bargaining history may prove very useful to an arbitrator * * * it is of no legitimate use to a court in deciding whether to order the company to submit the grievance to an arbitrator."

 Defendant relies upon Communication Wkrs. of Amer. v. Pacific N. W. Bell Tel. Co., 337 F.2d 445 (9 Cir. 1964), in support of a conclusion contrary to the holding of the A. S. Abell Co. case. If the decisions are in conflict, manifestly, this Court must follow the holding of the A. S. Abell Co. case. The A. S. Abell Co. case held that the bargaining history proffered in that case was solely for the arbitrators when the contract gave them authority to construe its terms. The Ninth Circuit held that the evidence upon which the district court based its finding that the dispute in that case was

not arbitrable met the "most forceful" test of Warrior & Gulf. If the Court were required to make its ultimate decision in the case at bar on the basis of defendant's evidence, it could conclude that defendant's evidence fails to meet the "most forceful" test.

Defendant has failed to point to any provision of the agreement which clearly and unmistakably excludes the question in dispute from the jurisdiction of the Labor-Management Committee. It has offered no evidence of such exclusion by any supplemental agreement. The evidence which it did present, strictly speaking, may not be termed evidence of bargaining history. Unlike the evidence in Communication Wkrs. of Amer. v. Pacific N. W. Bell Tel. Co., supra, on which it relies, it has not shown any of the negotiations between the parties leading up to the execution of the agreement to demonstrate what meaning the parties ascribe to the concept of "grievance" or the concept of "questions in dispute relating to this Agreement." At most, it has shown what has been the tacit interpretation of the parties under a collective bargaining agreement prior to the one which is the subject of this law suit, and various post-execution acts and declarations of the parties to the agreement, as shedding some light on their understanding of its meaning. Defendant's evidence may be characterized as evidence of reasons why the agreement should not be construed as the Labor-Management Committee construed it, but not evidence of why the Labor-Management Committee should not have decided that question or its authority to decide that question. In short, in regard to an agreement which is not clear beyond rational debate, defendant has proved, at most, only why the agreement should be construed in accordance with its contention, but has failed to prove why the tribunal the parties themselves expressly agreed upon should not have decided that question.

Defendant does not resist enforcement of the award on the ground that it is too general or vague to permit its enforcement. At the same time, the Court is aware that the award does not specify how many employees are involved, what employees are involved, or what amounts of money should be paid to any employee or to either pension fund. No mention has been made of the provision of the award relating to defendant's failure to employ the referral system. How a past violation of the agreement with respect to referrals is to be corrected after the fact is not made clear by the award. Presumably, however, the other aspects of the award could serve as a basis for agreement between the parties of how to effectuate the award; or, if they are unable to agree, a supplementary determination by the Labor-Management Committee or the Council on Industrial Relations in that regard will dispose of the matters remaining open.

For these reasons, therefore, the Court concludes that the award should be enforced. Counsel may agree upon a form of order, to be presented within ten (10) days.