328 F.2d 381
 LOCAL 12298, DISTRICT 50, UNITED MINE WORKERS OF AMERICA and District 50 United Mine Workers of America, Plaintiffs-Appellants,
v.
The BRIDGEPORT GAS COMPANY, Defendant-Appellee.
 No. 164.
 Docket 28426.
 United States Court of Appeals Second Circuit.
 Argued November 4, 1963.
 Decided February 27, 1964.
 
 John A. Arcudi, Bridgeport, Conn., for plaintiffs-appellants.
 Charles R. Covert, Bridgeport, Conn. (James F. Stapleton, and Marsh, Day & Calhoun, Bridgeport, Conn., on the brief), for defendant-appellee.
 Before WATERMAN, MOORE and SMITH, Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge.
 
 
 1
 Local 12298, District 50, United Mine Workers of America, and District 50 United Mine Workers of America appeal from an order of the United States District Court for the District of Connecticut, William H. Timbers, District Judge, denying their petition to compel arbitration under a collective bargaining agreement and, sua sponte, granting summary judgment for the Bridgeport Gas Company. We hold the dispute one subject to arbitration, and reverse the judgment.
 
 
 2
 The Bridgeport Gas Company determined that there was insufficient work to justify filling a position left vacant by an employee's retirement and, therefore, declined to post notices of a vacancy. The union claims that the company's conduct violated Sections 7 and 8 of Article II[1] of the collective bargaining agreement then in force. Section 7 provides that the company will post notices of vacancies and will consider written applications of employees for the position, while Section 8 provides that the union will be notified before a position is permanently filled. The company contends that these sections are rendered inapplicable by Section 5 of Article I,[2] which vests the exclusive right to relieve employees from duty for lack of work in the company. According to the company, there is no vacancy because it has determined that the job retired from was unnecessary and eliminated it.
 
 
 3
 The collective agreement contains a multi-step grievance procedure under which all disputes between the union and the company as to the meaning and application of the collective agreement with respect to rates of pay, wages, hours of employment, and other conditions of employment shall terminate by arbitration if not resolved by an earlier step in the outlined procedure.[3] The contract also contains a "no strike" provision,[4] the quid pro quo for the arbitration clause.
 
 
 4
 In Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), the Supreme Court held that § 301(a) of the Labor Management Relations Act, 61 Stat. 156 (1947), 29 U.S.C. § 185(a) (1958), permitted the federal courts to enforce grievance arbitration provisions in collective agreements, and that the federal courts were to be guided by the national labor policy of promoting industrial stabilization through adherence to the terms of the collective bargaining agreement. Id. 353 U.S. at 455, 77 S.Ct. at 917, 1 L.Ed.2d 972. Three years later, in United Steelworkers of America, A.F. L.-C.I.O. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1352-1353, 4 L.Ed.2d 1409 (1960), the Supreme Court announced that "[t]o be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."
 
 
 5
 Thus, the court's role is confined to ascertaining whether the party seeking to compel arbitration is making a claim which on its face is covered by the language of the grievance arbitration clause. We hold that the broad language of this arbitration clause can fairly be interpreted to cover this dispute, particularly since any doubts are to be resolved in favor of arbitrability. The parties have agreed to submit to the arbitrator all unsettled grievances relating to the meaning and application of the collective agreement with respect to pay rates, wages, hours, and "other conditions of employment." We think it clear that the posting of vacancies and the right of employees to apply to fill them can be encompassed within the term "conditions of employment." Since the union contends that Sections 7 and 8 of Article II have been contravened by the company's conduct, and the company contends that these sections are inapplicable, there is plainly a dispute about the meaning and application of the collective agreement with respect to a condition of employment.
 
 
 6
 One question remains. Did the language of Section 5 of Article I, a management functions clause, which provides in pertinent part that "the right to relieve employees from duty because of lack of work is vested exclusively in the Company * * *," exclude disputes about the existence of vacancies from those disputes which must be submitted to arbitration? In order to exclude from arbitration a dispute which on its face appears to be encompassed by the arbitration clause, the collective agreement must contain a clear and unambiguous exclusionary clause or some other term "that indicates beyond peradventure of doubt that a grievance concerning a particular matter is not intended to be covered by the grievance and arbitration procedure set forth in the agreement." Procter & Gamble Independent Union of Port Ivory, N. Y. v. Procter & Gamble Mfg. Co., 298 F.2d 644, 646 (2 Cir. 1962). The management functions clause in this case says nothing about vacancies being improper subjects for arbitration; it does not even say that relieving employees from duty for lack of work shall be excluded from arbitration. Even if one reads "exclusively" as evidencing an intention to qualify the arbitration clause, there is a difference between relieving a working employee from duty and refusing to fill a vacancy. It may be that the power to refuse to fill a vacancy can be implied from the power to relieve an employee from duty, but that is a question as to the merits of the grievance and must be left to the arbitrator. Moreover, the processing of even frivolous claims may have a therapeutic value in preserving industrial peace. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). The party claiming exclusion has a heavy burden, Livingston v. John Wiley & Sons, Inc., 313 F.2d 52, 60 (2 Cir. 1963). Here the company has presented no "forceful evidence of a purpose to exclude the claim from arbitration," and we decline to become "entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator." United Steelworkers of America, A.F.L.-C.I.O. v. Warrior & Gulf Nav. Co., supra, 363 U.S. at 585, 80 S.Ct. at 1354, 4 L.Ed.2d 1409.
 
 
 7
 The District Court's judgment is reversed, and the case is remanded with instructions to grant the plaintiff's petition to compel arbitration.
 
 
 
 Notes:
 
 
 [1]
 "Section 7. Notice of Vacancies
 "The Company will post notices of vacancies in positions in the occupations and classifications of employees represented by the Union and it will consider applications of employees for such positions if they are presented in writing, including a statement of the qualifications of the applicant within the time limits for posting as set forth below.
 "Section 8. Duration of Vacancy Postings
 "Notice of the vacancy will be posted for three (3) working days in the department in which the vacancy occurs. If the vacancy is not filled at the departmental level, then the notice of the vacancy will be posted plantwide for five (5) working days.
 "Before a position is permanently filled, the Union will be notified and if an employee's qualifications are questioned, he may have them passed upon at a meeting between the Union and the Company.
 "In any event, the vacancy shall be filled within a maximum of fifteen (15) working days after the expiration of the final posting of any job(s) which may be filled because of the selection of the bidder on the first posting."
 
 
 [2]
 "Section 5. Management Functions
 "A. The direction of the employed personnel, including the right to hire, to suspend or discharge for proper cause, to transfer, promote or demote, and the right to relieve employees from duty because of lack of work is vested exclusively in the Company, provided that this will not be used for the purpose of discrimination against any employee.
 "B. The right to determine who are to hold supervisory foremanship, or other supervisory positions, is vested exclusively in the Company."
 
 
 [3]
 
 "ARTICLE XIII
 "Grievance Procedure
 "Should any differences arise between the Company and the Union covered by this agreement as to the meaning and application of this agreement, with respect to rates of pay, wages, hours of employment and other conditions of employment, the procedure of settlement shall be in the following manner:
 * * * * *
 "Section 64. Arbitration
 "Step 3 — If the grievance is not adjusted in Step 2, the Union may request arbitration by sending written notice to Monsignor Joseph F. Donnelly and the Company within ten (10) working days after receipt of the Step 2 answer. Monsignor Donnelly shall act as arbitrator * * * The arbitrator's award shall be final and binding, but the arbitrator shall have no power to add to, subtract from, or modify in any way, the specific terms and provisions of the agreement."
 
 
 [4]
 
 "ARTICLE III
 "Strikes and Lockouts
 "Section 15. No Strikes and Lockouts
 "The Company agrees that during the life of this agreement there will be no lockouts and the Union agrees there will be no strikes, slowdowns or stoppages of work."
 
 
 LEONARD P. MOORE, Circuit Judge (dissenting):
 
 8
 Plaintiffs (collectively, the "Union") appeal from a judgment dismissing the complaint on the merits, and from an order denying motions to reopen the judgment, to reargue the law, to reconsider the judgment and for a trial. The judgment was based upon the denial of the Union's motion for summary judgment and the granting of summary judgment in favor of defendant, The Bridgeport Gas Company (the "Company").
 
 
 9
 The litigation was initiated by a petition by the Union to compel arbitration of an alleged grievance. The petition alleged, in substance, that the collective bargaining agreement between Union and Company provided for arbitration of unresolved differences between them; that the grievance arose out of the retirement of a veteran employee, William Hulton, for whose position the Company had failed to post a notice of vacancy; that pursuant to the agreement the Union had submitted the matter to the Rt. Rev. Msgr. Joseph F. Donnelly for arbitration but that the Company refused to participate therein. The Union then sought an order compelling arbitration.
 
 
 10
 The Company, in turn, claimed that some months prior to Hulton's retirement on October 31, 1961 (he had been a collector of old bills and claims), it had decided to change its practices so that continuation of the existing number (3) of employees in this job classification was not warranted. However, it continued Hulton until his retirement date but then determined that no vacancy existed because of lack of work. Consequently, the Company refused to post a notice of vacancy for the then non-existing (according to its managerial judgment) position.
 
 
 11
 The district court took the case on "pleadings, motions, affidavits and briefs" and after argument denied the Union's summary judgment motion and, sua sponte, granted summary judgment in favor of the Company. Its decision was based upon five grounds, (1) the Company's determination that no vacancy existed upon Hulton's retirement because of a lack of work did not constitute a grievance within the terms of the agreement; (2) the dispute did not relate to "rates of pay, wages, hours of employment and other conditions of employment" and, hence, did not come within the scope of matters to be submitted to arbitration; (3) the dispute did relate to exclusive managerial functions; (4) the history of labor negotiations between Union and Company confirmed the understanding that it was management's exclusive function to determine the nonexistence of a vacancy due to lack of work; and (5) that the Company's position was supported by recent decisions.
 
 
 12
 The Union relies heavily upon the three Steelworkers cases in the Supreme Court[1] and many post-Steelworkers decisions in this circuit. Naturally, there can be no disagreement with the fundamental proposition advanced in these cases that arbitration contributes to industrial peace and should be the means of settling disputes whenever possible. "Doubts should be resolved in favor of coverage." United Steelworkers of America, A.F.L.-C.I.O. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). However, the Supreme Court has said that "arbitration is a matter of contract"; that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," Warrior & Gulf, supra, 363 U.S. at 582, 80 S.Ct. at 1352-1353, 4 L.Ed.2d 1409; and that "the issue of arbitrability is a question for the courts," Drake Bakeries, Inc. v. Local 50, American Bakery and Confectionary Workers Intern. etc., 370 U.S. 254, 256, 82 S.Ct. 1346, 1348, 8 L.Ed.2d 274 (1962). Obviously then, not only cannot the facts and agreements in each case be ignored, they are controlling.
 
 
 13
 From the record here presented (affidavits, exhibits and collective bargaining agreements), a picture is revealed of a union-employer relationship expressed in collective bargaining agreements for some ten years. The 1954 agreement provided that "the right to relieve employees from duty because of lack of work is vested exclusively in the Company." Although placed in a paragraph under the subheading "Layoffs Due to Conversion" [i. e., to natural gas], there was a provision that "The Company does not limit its right to retire without replacement employees eligible for retirement, * * *."
 
 
 14
 In the negotiations leading to the 1959 contract, the Union submitted a proposal that "In the event that a job becomes vacant due to retirement, * * * [and] the company does not fill such vacancy due to the lack of work * * *; the company must first meet with the Union Committee and present tangible evidence of reason for their action." This proposal was not incorporated in the agreement. A provision sought by the Union to be placed in the 1960 contract that "No job shall be abolished regardless of the reason" was not inserted.
 
 
 15
 The 1961 agreement now in issue specifically provided (Art. I, Sec. 5): "A. The direction of the employed personnel, including * * * the right to relieve employees from duty because of lack of work is vested exclusively in the Company, * * *."
 
 
 16
 Appellant Union argues that there was no express provision excluding this alleged grievance from arbitration. Appellee Company claims that the contract specifically excluded the dispute in issue from arbitration. As to appellant's argument, no draftsman no matter how skillful and imaginative could draft an agreement which listed every retained prerogative of management. As to appellee's argument, appellee appears impliedly to concede that a history of the bargaining would show the intention of the parties and that "the courts have considered bargaining history as part of the `background which gave rise' to the inclusion of specific language."
 
 
 17
 The District Court did not conduct a trial or take oral testimony. It relied upon affidavits and the exhibits annexed thereto. Although there is no doubt that the court could grant summary judgment in favor of defendant Company despite the fact that no motion therefor was made, 6 Moore, Federal Practice, ¶ 56.12 (2d ed. 1953); International Hod Carriers Bldg. and Common Laborers' Union of America v. Mason Tenders Dist. Council, etc., 291 F.2d 496, 505 (2 Cir. 1960), nevertheless the Union should have been given the opportunity which it sought on its motion to reopen to present testimony as to what has been done concerning vacancies and the Company, in its turn, the opportunity to show the previous rejections of any limitations on management's exclusive right to make its decision as to the future of any job made vacant due to retirement and not filled "due to lack of work or any other reason." As the Supreme Court has said "arbitrability is a question for the courts." The answer must come from the contract and the intention of the parties as disclosed therefrom and from the testimony of the parties. The many decisions cited by both parties were dependent upon the particular facts in each particular case. And so should be the situation here. Until this intention is determined these other cases allegedly authoritative cannot supply an interpretation of this agreement. Only by such procedure can the factual determination, indicated as essential by the Supreme Court in the Steelworkers cases, be satisfied.
 
 
 18
 The primary purpose of arbitration under employer-employee agreements is to settle disputes without resort to the courts where such an understanding actually exists — not to force the creation of any such understanding as do the majority here. Thus, if the Union should decide that it would prefer to have the Company scrap the machines in its accounting department and substitute twenty new employees to make the entries long-hand in large books in the manner of the 1890's, it would seem as logical to submit such a demand for determination to the arbitrator as to say that he is to decide how the company is to run its bill collection department. I would require a more definite expression of the contractual intention of the parties before surrendering the managerial functions of the Company's president and board of directors to an arbitrator. If this be the true intention of the parties (and I find no such intention self-evident from the written agreement before us) I would wish to see it developed by further proof together with proof that the arbitrator, whether he be monsignor or professor, had enough time away from the diocese or the classroom to become conversant with the current problems attendant to the proper management of the Bridgeport Gas Company and to render the services to which the consumers and the Public Utilities Commission are entitled from the Company's management.
 
 
 19
 Accordingly, I would reverse the judgment below and remand the action for the taking of oral testimony and the filing of appropriate findings and conclusions of law based thereon. Cf. Central Aviation & Marine Corp. v. International Union etc., 319 F.2d 589 (2 Cir. 1963).
 
 
 
 Notes:
 
 
 [1]
 United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S. Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers of America, A.F.L.-C.I.O. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)