**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS (AFL-CIO)** and **Auburn Electronics Local 967, International Association of Machinists and Aerospace Workers (AFL-CIO), Petitioners,**

v.

**GENERAL ELECTRIC COMPANY, Respondent.**

**Civ. A. 68-CV-2.**

United States District Court
N. D. New York.
March 19, 1968.

of Bond, Schoeneck & King, Syracuse, N. Y., for respondent.

TIMBERS, District Judge.*

## QUESTIONS PRESENTED

In this action arising under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1964), invoking remedies pursuant to Section 4 of the United States Arbitration Act, 9 U.S.C. § 4 (1964), the union's petition filed January 3, 1968 to compel arbitration, pursuant to a collective bargaining agreement between the parties, of a dispute resulting from the company's notifying a substantial number of production and maintenance employees in a bargaining unit engaged in the manufacture of semiconductor rectifiers not to report for work on July 3, 1967, presents essentially the following questions:

(1) Whether the dispute resulting from the company's notifying approximately 85% of the production and maintenance workers at its Auburn, New York, plant not to report for work on July 3, 1967 is subject to arbitration pursuant to the arbitration clause in the collective bargaining agreement?

(2) Whether the summary remedies of the United States Arbitration Act are available in this action arising under Section 301 of the Labor Management Relations Act?

After holding a hearing at Syracuse on January 8, 1968 and upon consideration of the oral arguments, the petition, the answer, the affidavits, the exhibits and the extraordinarily helpful briefs submitted by able counsel on both sides, the Court concludes that the dispute between the parties is subject to arbitration under the agreement; that the remedies of the Arbitration Act are available in this action under the Labor Management Relations Act; and, accordingly, that the union is entitled to an order granting its petition to compel arbitration.

Bernard T. King, of Blitman & King, Syracuse, N. Y., for petitioners.

Robert W. Kopp (Tracy H. Ferguson and Edwin M. Shultes, III, on the brief),

* Chief Judge of the District of Connecticut, sitting by designation.

The Court makes the following findings of fact and conclusions of law in support of its order compelling arbitration.

## FINDINGS OF FACT

(1) Petitioners, International Association of Machinists and Aerospace Workers (AFL–CIO) and Auburn Electronics Local 967, International Association of Machinists and Aerospace Workers (AFL–CIO) (hereinafter, "the union"), are labor organizations within the meaning of Sections 101 and 301 of the Labor Management Relations Act, 29 U.S.C. §§ 152 and 185 (1964) (hereinafter, "the LMRA").

(2) Respondent, General Electric Company (hereinafter, "the company") is an employer in an industry affecting commerce within the meaning of Sections 101 and 301 of the LMRA.

(3) On November 10, 1966, the company and the union executed a collective bargaining agreement (hereinafter, "the agreement") effective for the period from October 20, 1966 through October 26, 1969.

(4) Relevant provisions of the agreement are set forth in the margin as follows: ARTICLE IV, WORKING HOURS;[1] ARTICLE XII, REDUCING AND INCREASING FORCES;[2] and ARTICLE XVI, ARBITRATION.[3]

**1.**
### "ARTICLE IV
### WORKING HOURS
*Section 1*

Eight (8) hours of work in a given day shall constitute a regular work shift. Such regular work shifts shall be continuous except for an interruption of not more than one (1) hour for a lunch period. In the event of three-shift operation, the shifts may consist of less than eight hours each. Any grievance resulting from the establishment of such shifts shall be subject to the grievance procedure. An employee's workday is the 24 hour period beginning with his regularly assigned starting time of his workshift, and his day of rest starts at the same time on the day or days he is not scheduled to work.

Five (5) days, Monday through Friday, shall constitute a regular workweek. An employee's workweek starts with the start of his regularly assigned work period on Monday of that workweek. Upon commencing work on Monday at a newly assigned starting time which is earlier than his starting time during the preceding week, the workday immediately preceding such Monday shall end provided the employee has had a 24 hour period of rest prior to the newly assigned starting time.

The Company shall provide employees the full hours of their regular assigned workday and workweek unless the Company has justifiable valid reasons for not doing so.

\* \* \*

*Section 3*

When a change is made in the hours of work or working schedule of a substantial number of employees of the plant or a unit thereof, the Company will discuss the change with the Union and shall then notify the affected employees and the Union at least one week in advance of the effective date of such change. When a change is made in the hours of work of individuals or smaller groups of employees, the Foreman will give the affected employees as much notice as possible. Any grievance resulting from a change in working schedule shall be subject to the established grievance procedure."

**2.**
### "ARTICLE XII
### REDUCING AND INCREASING FORCES
*Section 1—Layoff Procedure*

Whenever it is necessary, due to lack of work, to lay off or demote employees from any classification, the employees to be removed from the classification shall be selected on the basis of their seniority, provided the remaining employees are fully qualified on the job. Employees who are so removed will be permitted to displace shorter service employees on the same or similar work (but not on higher rated jobs) throughout the bargaining unit, provided no training beyond a reasonable breaking-in time will be required. Such transfers will be made as soon as the necessary openings can be created by removing the shorter service employees.

The foregoing paragraph shall not apply as between temporary probationary employees; nor in cases of temporary layoffs. Temporary layoffs shall not exceed more than 10 working days on any single occasion, nor more than 30 working days in any calendar year.

---

3. See Note 3 on Page 416.

(5) On June 26, 1967, the company's plant newspaper (S-P-D Headliner) carried the following announcement:

"FOUR-DAY WEEKEND FOR MANY AUBURN EMPLOYEES

July 4—next Tuesday—is the fourth of eight paid holidays which eligible Auburn SPD employees will enjoy this year. In addition . . .

A four-day weekend over the Fourth of July lies in store for most hourly-paid employees at the Auburn plant. Many salaried employees may wish to take advantage of the same situation.

Employees who are removed from their jobs because of lack of work and who are not offered a job on which the job rate is within two (2) steps of the job rate of their former job may elect to *accept a layoff for lack of work* rather than accept the lower rated job.

In case of a permanent layoff any time out to effect adjustments in the work force will not exceed seven working days.

For other than temporary layoffs, employees will be given at least one (1) week's notice during which period they shall receive at least one (1) week's work at the prevailing schedule.

\* \* \* "

3.  "ARTICLE XVI

    ARBITRATION

1. Any grievance which remains unsettled after having been fully processed pursuant to the provisions of Article XV, shall be submitted to arbitration *upon written request of either the Union or the Company,* provided such request is made within 30 days after the final decision of the Company has been given to the Union pursuant to Article XV, Section 2, and provided it involves,

    (a) the *interpretation or application* of any of the following provisions of this Agreement, except as otherwise specified:

    Article II, Check-Off Dues

    Article III, Discrimination & Coercion, Paragraphs 1 and 2

    Article IV, Working Hours, except as to issues involving the Company's right to schedule shutdowns.

    Article V, Overtime, except as to *issues involving the Company's* right to schedule overtime.

    Article VI, Section 1, Report-In Time

    Article VI, Section 2, Call-In and Early Reporting Time

    Article VI, Section 3, Death-in-Family Absence

    Article VI, Section 4, Jury Duty

    Article VI, Section 5, Night Shift Premium

    Article VI, Section 6, Military Pay Differential

    Article VII, Wage Rates, except as to issues involving the Company's right to establish or modify job classifications, rates of pay or performance standards, decide the appropriate job classification or qualifications of employees and determine the method by which employees will be paid.

    Article VIII, Holidays

    Article IX, Vacations, except as to issues involving the Company's right to schedule vacation shutdown periods.

    Article X, Continuity of Service —Service Credits

    Article XI, Seniority

    Article XII, Reducing and Increasing Forces

    Article XV, Section 1, Recognition of Representatives

    Article XIX, Section 2, Working Conditions

    Article XIX, Section 3, Accident and Dispensary Time

    (b) a disciplinary penalty, including discharge; but not including demotions or removals for non-disciplinary reasons such as inability to perform the work, or discharges effected under the Company's Policy 20.4. The standard to be applied by an arbitrator to cases involving disciplinary penalties, including discharge, is that such penalties shall be imposed for just cause.

2. (a) No more than one grievance shall be submitted at the same time to any arbitrator except when the Union and the Company agree in writing to do so.

    (b) Any grievance which remains unsettled after having been fully processed pursuant to the provisions of Article XV, and which involves any issue not included among those specified as subject to arbitration in Section 1 of this Article, shall be sumbitted to arbitration if the Company and the Union mutually agree in writing to do so.

Most hourly employees will not work next Monday, July 3. Hourly employees are requested not to report to work on that day unless specifically requested to do so by their supervisor.

This one-day halt in production activities will provide our business with an excellent opportunity to readjust inventories to meet our current product order levels. And although Monday will be taken off without pay, it is hoped that this policy will satisfy the many employees who have requested that the Fourth of July holiday weekend be extended to four days.

All salaried employees will work a normal work day on Monday, July 3, unless specific arrangements have been made otherwise by an employee with his manager.

Included among these specific arrangements may be the election of a salaried employee to take July 3 as a regular vacation day (if he is entitled to paid vacation time), or simply to take the day off without pay. In either case,

prior approval of the employee's manager must first be obtained."

(6) The union did not receive any formal notice from the company of the change in working hours or working schedule for July 3, nor did the company discuss the change with the union, such notice and discussion being required by Article IV, Section 3, of the agreement. The union was informally notified of the change in working hours and schedule for July 3 at a meeting with the company for an unrelated purpose on June 29.

(7) The multi-step grievance procedure provided for in Article XV of the agreement was invoked by the union on June 29 by filing a written grievance as follows:

"Violation of 1966–1969 IAMAW—GE Agreement Art IV Section 1 The Co. has notified employees not to report to work Mon. July 3rd 1967. Thereby depriving these employees of their regular hours of work, thus causing them to lose earnings for week of

3. Promptly following a written request of arbitration pursuant to Section 1 above, the parties shall endeavor to agree upon an arbitrator. If within 14 calendar days following such a request they fail to agree, the parties shall jointly request the Federal Mediation and Conciliation Service to submit a panel of five recognized arbitrators from which an arbitrator shall be chosen. Upon receipt of such panel, representatives of the Company and the Union shall strike in alternate turn one of the names from the panel list until 4 names have been so struck whereupon the arbitrator whose name remains shall be deemed to be the arbitrator selected by mutual agreement of the parties. Every effort will be made by the parties hereto to complete the selection of an arbitrator within 10 working days after the receipt of such panel.

4. (a) The award of an arbitrator so selected upon any grievance subject to arbitration as herein provided shall be final and binding upon all parties to this Agreement, provided that no arbitrator shall have any authority to add to, detract from, or in any way alter the provisions of this Agreement.

(b) In addition, notwithstanding any contrary provision of this Article, (i) no provision of this Agreement or other agreements between the parties shall be subject to arbitration pertaining in any way to the establishment, administration, interpretation or application of Insurance or Pension Plans or other benefit plans in which employees covered by this Agreement are eligible to participate; (ii) no arbitrator shall have the authority to review, revoke, modify or enter any award with respect to, any discipline or discharge imposed on employees having less than 60 days of continuous service with the Company; and (iii) no matter or controversy concerning the provisions of Article XIII of this Agreement: Income Extension Aid, or the interpretation or application thereof, shall be subject to arbitration.

5. The arbitrator's fees and expenses shall be borne equally by both parties. The party making a request for a transcript of the hearing shall bear its expense."

July 3rd. We request that all employees be reinburst (sic) for any and all loss of earnings, resulting from this violation."

(8) On August 6, the company's answer to the grievance was filed as follows:

"Production requirements made it necessary for a one day temporary lack of work in most areas of the Plant, as provided for in Article 12 Section I. July 3rd was chosen since it would provide affected employees with a four day weekend and would avoid a double start up."

(9) Under date of August 25, 1967, the company's Personnel Practices Manager sent to the union's Shop Committee Chairman a memorandum headed "Subject—Temporary Layoff", reading, "Attached is a list of those employees who were on temporary layoff, July 3, 1967".

(10) The grievance having been processed through the grievance procedure without resolution, the union by letter dated October 14 requested arbitration of the dispute in accordance with the agreement.

(11) The company by letter dated October 26 replied that the grievance "does not raise an arbitrable issue".

(12) The union's instant petition to compel arbitration was filed in this Court on January 3, 1968. The company's answer thereto was filed January 8, and on the same date the Court held a hearing at which counsel were fully heard. At the January 8 hearing and within a week thereafter, the Court received affidavits submitted in support of the union's petition and in support of the company's answer thereto, respectively. Briefs by both sides were submitted on Feb. 14.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over the subject matter of, and the parties to, this action.

(2) The parties to the collective bargaining agreement expressly agreed (Article XVI, Section 1(a)) that there should be submitted to arbitration any unsettled grievance involving the interpretation or application of those provisions of the agreement, among others, relating to working hours (Article IV) and reducing and increasing forces (Article XII).

(3) The company's notification of a substantial number of employees in the bargaining unit not to report for work on July 3, 1967 fairly may be interpreted, as the union claims, to have constituted a change in working hours or working schedule (Article IV, Section 3) or a temporary layoff (Article XII, Section 1).

(4) The union as the party seeking to compel arbitration has made a claim which on its face is covered by the language of the grievance arbitration clause.

(5) The company's claim that its ordering employees not to report for work on July 3, 1967 constituted a shutdown (Article XVI, Section 1(a)), while raising a dispute about the interpretation or application of the working hours provision of the agreement, cannot be said with positive assurance to render the arbitration clause not susceptible of an interpretation which covers the asserted dispute, resolving doubts in favor of coverage.

(6) The summary remedies of the Arbitration Act are available in this action under the LMRA.

(7) The union is entitled to an order granting its petition to compel arbitration in accordance with the collective bargaining agreement of all issues arising out of the company's action from June 26, 1967 through July 3, 1967 allegedly in violation of the provisions of Articles IV and XII of the agreement.

## CLAIMS OF THE PARTIES

The union claims that the company's action in ordering 1069 out of 1243 production and maintenance employees at its Auburn plant not to report for work on Monday, July 3, 1967, constituted a change in "hours of work or working

schedule" for that day and the ensuing week which was subject to the notification and discussion requirements of Article IV, Section 3, of the agreement, which requirements were not complied with by the company. The union further claims that the company's action with respect to July 3 was a "temporary layoff" within the meaning of Article XII, Section 1; and the union refers to the company's own characterization of its July 3 action as a "temporary layoff" throughout the multistep grievance procedure. Unsettled grievances involving interpretation or application of the provisions of Articles IV and XII, the union urges, are expressly made subject to arbitration pursuant to Article XVI. Finally, the union points to the company's belated characterization of its July 3 action as a "shutdown", asserting that the company first claimed it to be a shutdown the day before the hearing in this Court on January 8, 1968—some six months after it ordered the employees not to report for work on July 3, 1967.

The company, on the other hand, claims that its July 3 action was a "shutdown" within the purview of one of the management functions clauses of Article XVI, Section 1(a), which excludes from arbitration "issues involving the Company's right to schedule shutdowns". The company asserts that the "one-day halt in production activities", referred to in the plant newspaper announcement of June 26 (Finding Of Fact (5), supra), was for the purpose of readjusting inventories necessitated by its having produced more semiconductor rectifiers than it was selling; that the shutdown was scheduled for July 3, a day intervening between a weekend and a holiday, to avoid the costs of a double shutdown and startup; and that, whereas 37,158 rectifiers were manufactured on July 5, no rectifiers were manufactured on July 3. Finally, the company alleges in its answer to the petition a second affirmative defense that the summary proceedings of the Arbitration Act are not available in this action under the LMRA; and, no complaint having been filed or summons

issued, this Court "is without jurisdiction in this matter."

The union rejoins that it does not seek arbitration of the company's *right* or lack of right to schedule a shutdown; that the plant in fact was not shut down on July 3, most salaried employees having worked and some production departments having been in full production; and that, assuming arguendo that the company's action of July 3 was a shutdown, it nevertheless constituted a change in "hours of work or working schedule" whch required the company to comply with the notification and discussion requirements, non-compliance with which has given rise to an unsettled grievance which is subject to arbitration. The union claims that the availability of the summary remedies of the Arbitration Act in this action under the LMRA is sanctioned by relevant decisional law and is in accord with the intent of Congress.

The foregoing is believed to be a fair statement of the essential claims of the parties. Other claims, and nuances of the stated claims, have been urged by both sides. All have been considered by the Court; but, in view of the Court's conclusion that the petition to compel arbitration should be granted, many claims urged by both sides upon the Court are believed to be more appropriate for consideration by the arbitrator.

## OPINION

*Dispute Is Subject To Arbitration*

The law here applicable is so well settled that hardly more than citation of the controlling decisions is believed necessary or appropriate.

Absent a clear provision in the collective bargaining agreement or other understanding between the parties that the arbitrator shall decide the issue of arbitrability, e. g., Metal Products Workers Union v. Torrington Co., 358 F.2d 103, 105 (2 Cir. 1966), it is for the Court to determine whether the parties have agreed that a particular matter is subject to arbitration and what issues are to be arbitrated. John Wiley & Sons,

420

Inc. v. Livingston, 376 U.S. 543, 546–547 (1964); Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241 (1962); Drake Bakeries, Inc. v. Local 50, 370 U.S. 254, 256–257 (1962); United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582–583 (1960); United Steelworkers v. American Mfg. Co., 363 U.S. 564, 568–569 (1960); Torrington Co. v. Metal Products Workers Union, 347 F.2d 93, 95–96 (2 Cir. 1965), cert. denied, 382 U.S. 940 (1965); Local 12298, Dist. 50, United Mine Workers v. Bridgeport Gas Co., 328 F.2d 381, 383–384 (2 Cir. 1964). And it is basic that, arbitration being a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers v. Warrior & Gulf Nav. Co., supra, at 582; John Wiley & Sons v. Livingston, supra, at 547; Metal Products Workers Union v. Torrington Co., supra, at 106.

■■■■ It follows of course that if the subject matter of a dispute is expressly excluded from arbitration by a clear and unambiguous exclusionary clause in the collective bargaining agr.ement, the party resisting arbitration cannot be compelled to arbitrate such a dispute. District 50, United Mine Workers v. Chris-Craft Corp., 385 F.2d 946 (6 Cir. 1967); United Aircraft Corp. v. Lodge 971 of International Association of Machinists, 360 F.2d 150 (5 Cir. 1966); Communications Workers of America v. New York Tel. Co., 327 F.2d 94 (2 Cir. 1964); Procter & Gamble Independent Union v. Procter & Gamble Mfg. Co., 298 F.2d 644, 646 (2 Cir. 1962). But the Supreme Court squarely held in United Steelworkers v. Warrior & Gulf Nav. Co., supra, at 582–583, that "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." Accord: American Radiator & Standard Sanitary Corp. v. Local 7 of International Brotherhood of

Operative Potters, 358 F.2d 455, 458 (6 Cir. 1966); Local 12298, Dist. 50, United Mine Workers v. Bridgeport Gas Co., supra, at 383–384.

In the instant case, an arbitration clause which in form has come to be recognized as standard provides for arbitration of any unsettled grievance involving the "interpretation or application" of some 19 articles of the collective bargaining agreement, with 4 exceptions. Included among the grievances expressly made subject to arbitration are those involving a change in working hours or working schedule (Article IV, Section 3) or a temporary layoff (Article XII, Section 1). The union claims that the company's ordering 1069 out of 1243 production and maintenance employees not to report for work on July 3 constituted a change in working hours or working schedule and, as such, was subject to the notification and discussion requirements of Article IV, Section 3; further, the union claims that the company's July 3 action constituted a temporary layoff. Such claims by the union on their face certainly bring the dispute squarely within the arbitration clause.

Evidently the company throughout the grievance procedure likewise regarded the dispute as involving a temporary layoff. In response to the union's grievance of June 29, referring specifically to Article IV, Section 1, of the agreement, and complaining about "depriving these employees of their regular hours of work, thus causing them to lose earnings for week of July 3rd" (Finding Of Fact (7), supra), the company answered on August 6 by referring to the company's July 3 action as "a one day temporary lack of work in most areas of the Plant, as provided for in Article 12 Section I" (Finding Of Fact (8), supra). A dispute involving the interpretation or application of Article XII is unquestionably subject to arbitration.

■■■ On the day before the hearing in this Court on the union's petition to compel arbitration—six months after the company ordered some of its employees

not to report for work on July 3—the company for the first time asserted the claim that its July 3 action constituted a shutdown and as such excluded the grievance from arbitration pursuant to the exclusion clause of Article XVI, Section 1(a), referable to Article IV. Aside from the belatedness of the company's asserted claim that its July 3 action constituted a shutdown, it is doubtful that it was a shutdown within the meaning of the agreement; the company's answer of August 6 referred to "a one day temporary lack of work *in most areas of the Plant*" (emphasis added); most salaried employees worked; and some production departments were in full production. Even if the company's July 3 action could be construed as a shutdown, it also constituted a change in hours of work or working schedule with respect to which the exclusion clause does not relieve the company of the requirements of notification and discussion.

■■ In short, the company clearly has failed to sustain the heavy burden upon it of satisfying this Court "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers v. Warrior & Gulf Nav. Co., supra, at 582–583. And, as suggested in *Warrior,* this Court declines "to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator." Id. at 585. Accord: Local 12298, Dist. 50, United Mine Workers v. Bridgeport Gas Co., supra, at 384.

■ The Court has not overlooked the advisability of ordering a further hearing to take oral testimony—a course viewed with favor by some in this Circuit. See Local 12298, Dist. 50, United Mine Workers v. Bridgeport Gas Co., supra, at 384–386 (dissenting opinion); Strauss v. Silvercup Bakers, Inc., 353 F.2d 555, 558 (2 Cir. 1965). Such course

in the instant case is believed to be neither necessary nor appropriate. The arbitration clause clearly covers the asserted dispute; and no amount of oral testimony, under the circumstances of this case, could reasonably be expected to satisfy the Court with positive assurance that the arbitration clause is not susceptible of that interpretation. Moreover, all evidence offered in this proceeding has been received by the Court; neither party has suggested the taking of oral testimony; and, indeed, although the Court specifically inquired at the hearing whether the parties wished to introduce relevant evidence bearing upon bargaining history which might throw some light upon the intent of the parties with respect to the portions of the arbitration clause here under consideration, counsel clearly indicated such bargaining history would be neither helpful nor appropriate at this stage of the proceedings, citing International Union of Electrical, Radio & Machine Workers v. General Electric Company, 332 F.2d 485, 488–491 (2 Cir. 1964), cert. denied, 379 U.S. 928 (1964). The Court agrees with the correctness of counsel's position in this regard.

*Summary Remedies Of Arbitration Act Have Been Properly Invoked*

■ The company, without elaborating on the "prejudice" from which it claims it is suffering as a result of this proceeding under the Arbitration Act, urges that it is "being deprived of the time limitations, discovery procedures and other orderly procedural and substantive protections of a plenary proceeding under the Federal Rules of Civil Procedure."

It had been the understanding of this Court that such argument has been foreclosed at least since the decision of the Supreme Court in Textile Workers v. Lincoln Mills, 353 U.S. 448 (1957), particularly when read in the light of the opinion of the Court of Appeals for the Fifth Circuit which it reversed, Lincoln Mills v. Textile Workers, 230 F.2d 81 (5

Cir. 1956); see dissenting opinion of Justice Frankfurter in Textile Workers v. Lincoln Mills, supra, at 466–469.

What the company seeks to do here is to resurrect the argument of more than a decade ago which it acknowledges was laid to rest by the Supreme Court in *Lincoln Mills,* namely, that Section 1 of the Arbitration Act, 9 U.S.C. § 1 (1964), excludes from its scope "contracts of employment" of workers engaged in interstate commerce. Compare those cases which held that the summary remedies of the Arbitration Act were not available in actions arising under the LMRA, Lincoln Mills v. Textile Workers, 230 F.2d 81 (5 Cir. 1956), rev'd, 353 U.S. 448 (1957); International Union v. Colonial Hardwood Floor Co., 168 F.2d 33 (4 Cir. 1948), with those cases which held such remedies were available in actions under the LMRA, Signal-Stat Corp. v. Local 475, 235 F.2d 298, 301–303 (2 Cir. 1956), cert. denied, 354 U.S. 911 (1957); Local 19 v. Buckeye Cotton Oil Co., 236 F.2d 776, 781–784 (6 Cir. 1956), cert. denied, 354 U.S. 910 (1957); Local 205 v. General Electric Company, 233 F.2d 85, 97–101 (1 Cir. 1956), aff'd, 353 U.S. 547 (1957); Tenney Engineering v. United Electrical R. & M. Wkrs., 207 F.2d 450 (3 Cir. 1953). And see Local No. 149 v. General Electric Company, 250 F.2d 922, 927–930 (1 Cir. 1957), cert. denied, 356 U.S. 938 (1958); Lodge No. 506 v. General Electric Company, 211 F.Supp. 654 (N.D. N.Y.1959).

Aside from whatever residual academic interest may still be lurking in the argument the company here seeks to resurrect, the record in the instant case most emphatically belies any claim of prejudice to the company from the proceedings in this Court to date—unless, as the company asserts, the prejudice consists of "being deprived of the time limitations." The company's action of July 3, 1967 gave rise to the dispute. Six months later, after the grievance procedure had failed to resolve the dispute, the union on January 3, 1968 filed in this Court its petition to compel arbitration. Five days later, on January 8, the company filed its answer and on the same date the Court held a hearing at which counsel were fully heard. At no time was a continuance of the hearing requested. At no time was testimony or other evidence offered which was not accepted by the Court. The only extensions of time requested—by both sides—were for the filing of briefs; all such extensions were granted, the briefs having been filed on February 14. The net result is that this entire proceeding in this Court has been concluded within approximately 2½ months from its commencement—a sharp contrast to the time schedule of a plenary action which "would produce the delay attendant upon judicial proceedings preliminary to arbitration." John Wiley & Sons v. Livingston, 376 U.S. 543, 548 (1964).

Furthermore, the various summary remedies of the Arbitration Act have come to be recognized as a matter of course in actions arising under the LMRA in recent years. See, e. g., Local 12298, Dist. 50, United Mine Workers v. Bridgeport Gas Co., 328 F.2d 381 (2 Cir. 1964), rev'g on other grounds, 222 F.Supp. 297 (D.Conn.1963) (§ 4 motion to compel arbitration); Bridgeport Rolling Mills Company v. Brown, 314 F.2d 885 (2 Cir. 1963), cert. denied, 375 U.S. 821 (1963) (§ 10 motion to vacate); Brown v. Bridgeport Rolling Mills Company, 245 F.Supp. 41 (D.Conn.1965) (§ 9 motion to confirm); Local 1078 v. Anaconda, 256 F.Supp. 686 (D.Conn.1966) (§§ 9 and 10 motions to confirm and vacate); Willson H. Lee Co. v. New Haven Printing Pressmen, 248 F.Supp. 289 (D.Conn.1965) (§§ 9 and 10 motions to confirm and vacate); Electric Specialty Co. v. Local 1069, 222 F.Supp. 314 (D.Conn.1963) (§§ 10 and 11 motions to vacate, modify or correct); Royal Industrial Union, Local 937 v. Royal McBee Corp., 217 F.Supp. 277 (D.Conn.1963) (§ 11 motion to modify or correct); Armstrong-Norwalk Rubber Corp. v. Local Union No. 283, 167 F.Supp. 817 (D.Conn.1958), appeal dismissed, 269

F.2d 618 (2 Cir. 1959) (§ 3 motion for stay pending arbitration).

### ORDER

ORDERED that:

(1) Petitioners' motion to compel arbitration is granted.

(2) Arbitration shall proceed as provided in the collective bargaining agreement of all issues arising out of the company's action from June 26, 1967 through July 3, 1967 allegedly in violation of the provisions of Articles IV and XII of the agreement.